IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| EVERETT CASEBOLT, | ) | CASE NO.  1:17-cv-00596 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Everett Casebolt ("Plaintiff" or "Casebolt") seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner")

denying his application for Supplemental Security Income ("SSI") benefits.  Doc. 1.  This Court

has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned Magistrate

Judge pursuant to the consent of the parties. Doc. 12.   As explained more fully below, the Court

**AFFIRMS** the Commissioner's decision.

## I.  Procedural History

On December 24, 2013, Casebolt protectively filed[1] an application for Supplemental

Security Income ("SSI").[2]  Tr. 15, 162-167.  He initially alleged a disability onset date of April

1, 1997 (Tr. 15, 162), but later amended his alleged onset date to October 3, 2013 (Tr. 15, 34,

168).  Casebolt alleged disability due to head trauma, head pain, blurred vision, headaches,

---

[1] The Social Security Administration explains that "protective filing date" is "The date you first contact us about filing for benefits. It may be used to establish an earlier application date than when we receive your signed application."  http://www.socialsecurity.gov/agency/glossary/ (last visited 2/20/2018).

[2] Casebolt had filed an application for Disability Insurance Benefits ("DIB") on October 3, 2013.  Tr. 15.  Casebolt later withdrew his DIB application.  Tr. 15-16, 168.

memory loss, hernia in stomach, and ADD.  Tr. 55, 81, 113, 183, 222.   Casebolt's application

was denied initially and upon reconsideration by the state agency.  Tr. 64, 96, 113-117.

Thereafter, he requested an administrative hearing.  Tr. 118-120.   On January 7, 2016,

Administrative Law Judge Peter Beekman ("ALJ") conducted an administrative hearing.  Tr. 32-

47.

　　　　In his March 14, 2016, decision (Tr. 12-31), the ALJ dismissed Casebolt's DIB claim in

light of Casebolt's decision to withdraw his DIB application (Tr. 15-16).  With respect to

Casebolt's SSI claim, the ALJ determined that Casebolt had not been under a disability from the

amended alleged onset date of October 3, 2013, through the date of the decision.  Tr. 16.

Casebolt requested review of the ALJ's decision by the Appeals Council.  Tr. 9-11.  On January

24, 2017, the Appeals Council denied Casebolt's request for review, making the ALJ's decision

the final decision of the Commissioner.  Tr. 1-6.

## II. Evidence

### A.　　　　Personal, educational and vocational evidence

　　　　Casebolt was born in 1963 and was 52 years old at the time of the hearing.  Tr. 25, 35,

162.  Casebolt attended school until 10th grade.  Tr. 35.  He was in special education classes.  Tr.

35, 275-278.  In 1976, the Wechsler Intelligence Scale for Children-Revised (WISC-R) was

administered to Casebolt while he was in school.  Tr. 275.  The test results showed a Verbal IQ

of 81; Performance IQ of 80; and Full Scale IQ of 79.[3]  Tr. 275.

---

[3] As discussed below in the opinion section, during a consultative psychological evaluation in March 2014, the
Wechsler Adult Intelligence Scale-IV was administered to Casebolt.  Tr. 291.  The test results showed a Verbal
Comprehension IQ of 66; a Perceptual Reasoning IQ of 88; a Working Memory IQ of 92; a Processing Speed IQ of
68; and a Full Scale IQ of 74.  Tr. 291.

At times, Casebolt has been homeless. Tr. 295, 341. At the time of the hearing, he was living with his girlfriend. Tr. 42. Casebolt's past jobs included delivery driver, laborer at a gas station, truck driver, security guard, and snow remover. Tr. 35, 39-40.

Aside from trying to find small jobs to make a couple of dollars (Tr. 38) Casebolt's most recent job was at Heisler Tool Company ("Heisler"), where he was employed from April 20, 2015, through October 16, 2015 (Tr. 40, 44, 263-264). He was working as a delivery driver and had to load trucks. Tr. 39-41. Casebolt was terminated from the position; he indicated that all his employer told him was that his "spot was being terminated." Tr. 40-41, 265. He noted that he did miss a lot of work because lifting and loading pallets into the truck was strenuous activity for him and he would get sick from straining. Tr. 40. In a questionnaire completed by a representative of Heisler, it was reported that Casebolt's work and attendance were below average. Tr. 264, 267. The employer also reported that that it was not aware of any special conditions requiring accommodations but the following problem areas were noted – needed instructions repeated more often than usual; problems staying on pace; problems completing tasks; and frequent absence. Tr. 265.

## B.      Medical evidence

### 1.      Treatment history

Most of Casebolt's medical care was received a long time ago at Mount Sinai. Tr. 295, 298. On August 19, 2014, Casebolt sought treatment at MetroHealth with complaints of abdominal pain. Tr. 295-304. Casebolt complained of pain starting about two weeks earlier in his left upper quadrant. Tr. 295. Casebolt reported a history of head trauma that occurred when he was in his late 20s. Tr. 295. He was kicked in the head and needed to have surgery on his left eye and face. Tr. 295. Casebolt reported that, following that incident, he had memory problems.

Tr. 295.  He also reported injuring his right foot when he was a teenager and needing surgery. Tr. 295, 296.  Casebolt relayed that he had been homeless for many years but was living with his sister at the time of his visit.  Tr. 295, 296.  Casebolt indicated he was seeking disability for financial assistance.  Tr. 295.  A head MRI was recommended in order to try to get a baseline for why Casebolt was having memory problems.  Tr. 298, 300.  A CT scan was also recommended to assess whether Casebolt had a hernia.  Tr. 300.  A neuro/psych evaluation was recommended in order to further assess Casebolt's memory loss.  Tr. 298.  Casebolt's CT scan of his abdomen/pelvis showed an umbilical hernia and bilateral inguinal hernias.  Tr. 305.

On October 17, 2014, Casebolt sought treatment at the MetroHealth emergency department with complaints of abdominal pain.  Tr. 309-324.  Casebolt relayed that his pain was typically a 4-5/10 but his pain had gotten worse and was an 8-9/10.  Tr. 309.  Casebolt described his pain as stabbing pressure that radiated into his back and chest.  Tr. 309.  He was most comfortable in a reclining position and when putting pressure on his abdomen.  Tr. 309.  His pain was worse with standing and walking.  Tr. 309.  Casebolt also reported dyspnea, a headache and visual change.  Tr. 309.  The attending physician observed no concerning findings on examination.  Tr. 310.  Casebolt's pain resolved without intervention while he was in the emergency room.  Tr. 310.  A referral was made to general surgery because of complaints of daily symptoms but it was noted that there was no emergent need for surgical intervention.  Tr. 310.

A few days later, on October 21, 2014, Casebolt saw Dr. Jonathan M. Kwong, M.D., in the general surgery department at MetroHealth for a consultation.[4]  Tr. 325-331.  Casebolt

---

[4] Casebolt also saw Carol J. Sams, CNP, at MetronHealth on October 21, 2014, as a follow up to his emergency room visit.  Tr. 332-340.  Nurse Sams diagnosed gastroesophageal reflux disease and prescribed medication.  Tr. 333, 340.

described his abdominal pain, noting it had gotten worse over the prior month.  Tr. 325.

Casebolt indicated that his pain was currently a 5/5 and constant.  Tr. 325.  He noted that the pain

was getting worse with weight lifting.  Tr. 325.  Dr. Kwong's impression was epigastric and right

upper quadrant pain unrelated to his hernias.  Tr. 328.  Dr. Kwong recommended a referral to GI

for further evaluation of the epigastric pain and he did not feel that surgical intervention was

necessary, unless Casebolt's hernia symptoms worsened.  Tr. 328.

On October 28, 2014, Casebolt saw Dr. Stacy Beard,[5] Ph.D., at MetroHealth for a mental

health assessment.  Tr. 341-349.  Casebolt reported not knowing why he was referred for a

mental health evaluation.  Tr. 341.  Dr. Beard noted that Nurse Sams had made a notation

regarding mood issues and memory loss.  Tr. 341.  Recent stressors for Casebolt included being

homeless.  Tr. 341.  He was staying with family members at the time of his assessment.  Tr. 341.

Casebolt reported suicidal ideation on occasion but no history of suicidal attempts or homicidal

ideation.  Tr. 341.  He reported having problems with worrying, occasionally being annoyed with

people, and anxiety.  Tr. 342.  Casebolt denied concentration problems but reported poor recent

and remote memory issues due to past head injury.  Tr. 342, 345.  Casebolt reported infrequent

panic attacks but indicated he experienced a panic attack about four months earlier.  Tr. 342.

Casebolt indicated that, when he has a panic attack, he gets nervous and feels like people are

coming after him, his heart starts racing and he sweats.  Tr. 342.  Casebolt reported some

flashbacks from a traumatic incident that occurred when he was a teenager.  Tr. 342.  He denied

paranoia or hallucinations.  Tr. 342.  Dr. Beard's diagnostic impression was "good attitude,

reported that there are things he cannot control but he tries daily, hx of trauma.  Main concern is

his need to find housing and employment, used to live w/his older sister but she moved back to

---

[5] The ALJ spelled the last name of doctor performing the mental health assessment "Board."  Tr. 22.  It appears that the correct spelling is "Beard."  Tr. 347.

WV[.]" Tr. 346. Dr. Beard's diagnosis was adjustment disorder, R/O PTSD. Tr. 346. Casebolt was not interested in counseling. Tr. 346.

On November 12, 2014, Casebolt saw Dr. Paul Cisarik, M.D., at MetroHealth for abdominal pain and fatty liver. Tr. 350-364. Casebolt complained of abdominal bloating, cramping, and epigastric pain in the left upper quadrant – symptoms that started about six months prior and generally occurred daily for several hours. Tr. 350. Casebolt indicated that his pain was worse if he went without eating. Tr. 350. He reported early satiety over the prior month. Tr. 350. Dr. Cisarik's assessment included fatty liver disease, GERD, and a recommendation for a colonoscopy to screen for colon cancer. Tr. 354. Dr. Cisarik also noted that Casebolt had a recent diagnosis of diabetes mellitus. Tr. 354. Dr. Cisarik's treatment notes indicate that Casebolt's girlfriend was called to explain Casebolt's medical plan because of Casebolt's short term memory issues and Casebolt's request that they call his girlfriend with the information. Tr. 354.

Also, on November 12, 2014, Casebolt saw Dr. Ikram Khan, M.D., in the neurology department at MetroHealth for a consultation regarding his headaches and prior head injury. Tr. 365-373. Dr. Khan noted that Casebolt had a normal head MRI in September. Tr. 366. Dr. Khan's impressions/suggestions were:

> 51 year[] old male seen in consultation for headaches likely migraines with aura. His MRI [is] negative for acute pathology. He is undergoing workup for his liver and epigastric pain that limits prescribing him pain medication. [N]o visual symptoms[.]

Tr. 369.

Dr. Khan prescribed Neurontin and advised him to return in six weeks. Tr. 369-370.

Casebolt had a colonoscopy on November 26, 2014. Tr. 374-414, 419-422. The post-procedure diagnoses were esophageal reflux; duodenal ulcer, unspecified as acute or chronic, without hemorrhage, perforation or obstruction; and colonic polyp. Tr. 687.

On December 2, 2014, Casebolt saw Nurse Sams. Tr. 423-440. Casebolt reported that his GERD was better but he was continuing to have headaches. Tr. 423. He relayed that he had applied for SSI but he was still trying to find work. Tr. 423. He was still sleeping in his van but hoping to move in with his girlfriend that week. Tr. 423. At Casebolt's request, Nurse Sams spoke with Casebolt's girlfriend over the phone because of his short term memory issues. Tr. 424. Nurse Sams provided a care plan for Casebolt, which included medication to treat his diabetes mellitus and GERD. Tr. 424-425.

On December 17, 2014, Casebolt saw Dr. Khan. Tr. 441-449. Dr. Khan noted that Casebolt was continuing to have headaches but Neurontin had helped so Dr. Khan increased Casebolt's dosage of Neurontin. Tr. 442, 445. That same day, Casebolt saw Dr. Cisarik for a follow-up visit. Tr. 450-461. Casebolt reported having much less abdominal pain. Tr. 450. He relayed that, if he forgets to take his medication, he gets left upper quadrant epigastric pain but had not had pain for at least three weeks. Tr. 450. Other than a random episode of heartburn when eating pizza, he had not had heartburn. Tr. 450. He was uncertain as to all the medications he was taking but noted that he had his medications in his van. Tr. 450. Dr. Cisarik counseled Casebolt regarding his various tests, procedures, and medication. Tr. 456.

On January 19, 2015, Casebolt saw Dr. Neil F. Sika, OD, at MetroHealth for a diabetes mellitus eye examination. Tr. 462-479. Casebolt reported occasional blurring and pain in his left eye. Tr. 462. He only wore over-the-counter reading glasses. Tr. 462, 463. For about a year, Casebolt had been experiencing occasional white flashes. Tr. 462. Dr. Sika diagnosed a

compound hyperopic astigmatism in the right eye, hyperopia in the left eye, and presbyopia in both eyes. Tr. 464. Dr. Sika provided Casebolt with a prescription for eyeglasses. Tr. 464. However, Casebolt did not have insurance to cover the cost so Dr. Sika recommended that Casebolt use over-the-counter reading glasses and monitor the situation over the next year. Tr. 464. Dr. Sika found no nonproliferative diabetic retinopathy at the time but advised Casebolt to keep tight control on his diabetes mellitus. Tr. 464.

On October 9, 2015, Casebolt saw Dr. Gwen Haas, M.D., at Lake Health, to establish a primary care physician relationship. Tr. 484-486. Casebolt complained of headaches and memory issues since being kicked in the head and he also complained of low back pain, foot numbness and a hernia. Tr. 484. Casebolt also relayed that he had a history of GERD and diabetes mellitus. Tr. 484. On examination of Casebolt's abdomen, Dr. Haas observed a ventral herniation without strangulation. Tr. 484. Dr. Haas's musculoskeletal examination was negative for erythema, swelling or joint deformities but Dr. Haas noted that Casebolt was positive for lumbar vertebral tenderness to percussion with no rashes. Tr. 484. Dr. Haas's examination of Casebolt's extremities was generally normal with slightly diminished patellar reflexes on the left. Tr. 484-485. Dr. Haas ordered blood work, provided prescriptions for treatment of sciatica, GERD, and diabetes mellitus. Tr. 485. Casebolt declined a surgical consultation for his ventral hernia. Tr. 485.

### 2. Medical opinion evidence

*Physical impairment opinions*

On February 14, 2014, Casebolt saw Dorothy A. Bradford, M.D., for a consultative physical evaluation. Tr. 279-287. Casebolt relayed numerous complaints – headaches, low back pain, knot in stomach that hurt when trying to lift or sit up, right foot pain, and left knee pain.

Tr. 284. Casebolt reported that he did not use an assistive device and he could walk/stand for 20 minutes and lift 50 pounds. Tr. 284. Dr. Bradford's physical examination was generally normal. Tr. 285-286. For example, Casebolt exhibited normal range of motion, stability, strength and tone in all extremities and in the head and neck. Tr. 286. Casebolt's gait was normal. Tr. 286. Dr. Bradford observed Casebolt's judgment and insight to be appropriate; he was oriented to person, place and time; he had normal recent and remote memory; his mood and affect were appropriate; his language was normal; and his speech had a normal rate, articulation, and spontaneity. Tr. 287. Dr. Bradford opined that:

> Claimant has had multiple musculoskeletal injuries as outline[d] above and now has pain that is probably due to DJD. On exam he has a very large and tender diastasis recti.[6] In my medical opinion he should be restricted to sedentary activity.

Tr. 287.

On July 9, 2014, state agency reviewing physician Eli Perencevich, D.O., completed a physical RFC assessment. Tr. 87-89. Dr. Perencevich opined that Casebolt had the RFC to lift/carry 20 pounds occasionally and 10 pounds frequently; stand/walk about 6 hours in an 8-hour workday; sit about 6 hours in an 8-hour workday; and push and pull unlimitedly, other than as indicated for lift/carry. Tr. 87. Dr. Perencevich's exertional limitations were based on reported pain and diastasis recti. Tr. 87. Dr. Perencevich opined that Casebolt had the following postural limitations – frequently climb ramps/stairs, never climb ladders/ropes/scaffolds, occasionally stoop, kneel and crouch, and never crawl. Tr. 87-88. Dr. Perencevich's postural limitations were due to Casebolt's 12 inch diastasis recti. Tr. 88. Dr. Perencevich also opined

---

[6] Diastasis recti abdominis is a "separation of the rectus muscles of the abdominal wall[.]" *See* Dorland's Illustrated Medical Dictionary, 32nd Edition, 2012, at 511.

that Casebolt would have to avoid concentrated exposure to vibration and even moderate

exposure to hazards (machinery, heights, etc.).  Tr. 88.

*Mental impairment opinions*

On March 14, 2014, Casebolt saw Dr. J. Joseph Konieczny, Ph.D., for a consultative psychological evaluation.  Tr. 288-294.  Dr. Konieczny observed that Casebolt was pleasant and cooperative and occasionally vague in his presentation but responsive to all questions and tasks posed to him.  Tr. 289, 290.  When asked about his current disability, Casebolt stated, "I have a lack of memory since I had my head kicked in."  Tr. 289.

When asked about his education, Casebolt relayed that he was involved in special education classes and repeated eighth grade.  Tr. 290.  He stated he dropped out of school during his tenth grade year because his parents moved.  Tr. 290.  He indicated he had participated in some adult education but did not obtain his Graduate Equivalency Diploma.  Tr. 290.

Casebolt was unable to recall when he was assaulted but he relayed he was knocked unconscious, has had ongoing headaches and left visual deficits, and significant memory problems.  Tr. 290.

Dr. Konieczny observed that Casebolt's ability to concentrate and attend to tasks showed no indications of impairment.  Tr. 291.  Casebolt performed serial three subtraction without error but his responses were slow.  Tr. 291.  He showed moderate deficits in his ability to perform logical abstract reasoning.  Tr. 291.  Dr. Konieczny observed that Casebolt exhibited mild deficits in his overall level of judgment and opined that Casebolt "would appear to require some degree of supervision and monitoring in the management of his daily activities and in handling his financial affairs."  Tr. 291.  Casebolt's WAIS-IV Full Scale IQ score was 74, which Dr. Konieczny opined placed him in the borderline range of adult intellectual functioning and Dr.

Konieczny indicated that Casebolt's "overall level of functioning is at a slightly reduced level of efficiency due to the impact of his intellectual deficits." Tr. 291-292.

In summary, Dr. Konieczny stated:

> . . . Casebolt suffers from a diagnosis of Borderline Intellectual Functioning. Again, although [he] apparently suffered a traumatic brain injury as a result of an assault episode some two to four years prior to the evaluation,[7] given his history, it would not appear that he has suffered from any significant intellectual deficits that may have been a residual effect of this history. No further diagnosis is offered.

Tr. 292.

Dr. Konieczny opined that Casebolt appeared sincere in his presentation and, while vague at times, the information provided by Casebolt appeared to be a reliable reflection of his then current situation. Tr. 292. Dr. Konieczny opined that Casebolt showed no significant limitations in his ability to understand, remember and carry out instructions and showed no significant limitations in his ability to pay attention and concentrate and persist in single and multi-step tasks. Tr. 292. With respect to responding appropriately to supervision and coworkers in the work setting, Dr. Konieczny opined that Casebolt would have some diminished tolerance for frustration and diminished coping skills which would impact his ability to respond to severe supervision and interpersonal situations in the work setting but he would seem capable of responding appropriately to "normal such situations." Tr. 292. With respect to Casebolt's ability to respond to pressure in the work setting, Dr. Konieczny opined that, because of his intellectual limitations, Casebolt would have some diminished tolerance for frustration and diminished coping skills which would impact his ability to respond to severe pressure situations

---

[7] There is some discrepancy in the record as to when the assault occurred. *Compare* Tr. 290 (Dr. Konieczny notes that medical records indicate that Casebolt's head injury occurred two years prior to his evaluation, i.e., 2012) *with* Tr. 442 (Dr. Khan's 12/17/14 treatment notes (medical history section) indicate that Casebolt was assaulted in the 1990's); *see also* Tr. 36 (Casebolt's hearing testimony, indicating he could not remember the year of the assault).

in the work setting but he would seem capable of responding appropriately to "normal such situations." Tr. 292.

On July 17, 2014, state agency reviewing psychologist Acracelis Rivera, Psy.D., completed a Psychiatric Review Technique ("PRT") and mental RFC assessment. Tr. 85-86, 89-91. In the PRT, Dr. Rivera opined Casebolt had moderate restrictions in activities of daily living; moderate difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence or pace; and no repeated episodes of decompensation, each of an extended duration. Tr. 85.

In the mental RFC assessment, with respect to understanding and memory limitations, Dr. Rivera opined that Casebolt was moderately limited in his ability to understand and remember very short and simple instructions and markedly limited in his ability to understand and remember detailed instructions. Tr. 89. Dr. Rivera further explained that Casebolt could understand and remember one-to-three step instructions and, opined that, occasionally, instructions may require repetition. Tr. 89. With respect to sustained concentration and persistence limitations, Dr. Rivera opined that Casebolt was moderately limited in his ability to carry out very short and simple instructions; moderately limited in his ability to maintain attention and concentration for extended periods; moderately limited in his ability to sustain an ordinary routine without special supervision; moderately limited in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and markedly limited in his ability to carry out detailed instructions. Tr. 89-90. Dr. Rivera further explained that Casebolt could perform one-to-three step tasks of a repetitive nature and, opined that Casebolt would benefit from having a supervisor or coworker available to occasionally

explain tasks and redirect.  Tr. 90.  With respect to social interaction limitations, Dr. Rivera

opined that Casebolt was moderately limited in his ability to ask simple questions or request

assistance; moderately limited in his ability to accept instructions and respond appropriately to

criticism from supervisors; moderately limited in his ability to get along with coworkers or peers

without distracting them or exhibiting behavioral extremes; moderately limited in his ability to

maintain socially appropriate behavior and adhere to basis standards of neatness and cleanliness;

and markedly limited in his ability to interact with the general public.  Tr. 90.  Dr. Rivera further

explained that Casebolt would not be well-suited for work that entails customer service,

persuasion or conflict resolution but he could interact with supervisors or coworkers

superficially.  Tr. 90.  With respect to adaptation limitations, Dr. Rivera opined that Casebolt was

moderately limited in his ability to respond appropriately to changes in the work setting and

moderately limited in his ability to set realistic goals or make plans independently of others.  Tr.

90-91.  Dr. Rivera further explained that Casebolt could adapt to a static work setting.  Tr. 91.

C.      **Testimonial evidence**

1.      **Plaintiff's testimony**

Casebolt was represented and testified at the hearing.  Tr. 35-44.

When the ALJ asked Casebolt to explain what his health problems were, Casebolt relayed

that he has frequent headaches, which started following an incident a few years prior when his

head was kicked in by individuals while he was working at a gas station.  Tr. 36.  Casebolt could

not remember exactly when the incident occurred but indicated he was working at a Shell gas

station.  Tr. 36.  Casebolt has a headache almost daily.  Tr. 42.  When Casebolt has a headache,

he sleeps for about three or four hours and then his headache is gone.  Tr. 42.  After his injury,

Casebolt had problems keeping up pace while at work.  Tr. 43.  He was told he "need[ed] to pick

up the slack[,]" was "too slow[,]" "need[ed] to pick up the pace[.]"  Tr. 43-44.  Casebolt would explain that he was moving as quickly as he could because he was hurt.  Tr. 44.

Casebolt also indicated that he has a hard time breathing; he has three hernias, and he has a hard time remembering things.  Tr. 36.  Since the incident at the Shell gas station, remembering things is a daily struggle for Casebolt and he stresses out about it, which causes headaches and causes his eyes to hurt.  Tr. 36, 41, 43.  When Casebolt sees his doctors, they will call his girlfriend when he is at a visit with information so that she can provide Casebolt with reminders.  Tr. 42.  His girlfriend provides reminders about most things.  Tr. 42.  Also, because of the headaches, his vision is blurry.  Tr. 36.  Casebolt also has diabetes and hearing loss in his left ear.  Tr. 37, 40.  He does not wear a hearing aid but has ringing in this ear.  Tr. 40.

On an average day, Casebolt hangs around his house; takes the dogs out for a walk; cleans up a little around the house; and, if he can find a small job to do for a couple of dollars, he will do that.  Tr. 38.  He is unable to lift a lot of weight because of his hernias.  Tr. 38.  He estimated being able to lift about 10-20 pounds.  Tr. 38.  Casebolt estimated being able to stand for about two hours before his lower back starts to hurt.  Tr. 43.  As for hobbies, Casebolt builds model cars.  Tr. 38.  Casebolt gets tired frequently and falls asleep easily.  Tr. 39.  Casebolt's girlfriend has told him that she thinks he sleeps too much.  Tr. 39.  He does not recall being tested for sleep apnea but indicated he has been told that his tiredness may be related to an underactive thyroid.  Tr. 39.  Casebolt is able to drive.  Tr. 43.  He uses GPS to help him know where he is going.  Tr. 43.

## 2. Vocational Expert's testimony

Vocational Expert ("VE") Paula Zinmeister testified at the hearing.  Tr. 44-46.  The VE described Casebolt's past work as follows: light truck driver (SVP 3, medium level); security

guard (SVP 3, light level); automobile service attendant (SVP 3, medium level); and groundskeeper (SVP 3, medium level).[8]  Tr. 44.

The ALJ asked the VE to assume a hypothetical person who is male, 52 years old, with less than a high school education who can lift/carry 20 pounds occasionally and 10 pounds frequently; stand/walk for 6 out of 8 hours; sit for 6 out of 8 hours; frequently push, pull and foot pedal; frequently use a ramp or stairs; occasionally climb a ladder, rope or scaffolds; constantly balance; frequently stoop, kneel, crouch or crawl; no manipulative, visual or communicative limitations; should avoid high concentrations of noise and perform no complex tasks but can perform simple tasks; no high production quotas; no piece rate work; no work involving arbitration, confrontation, negotiation, or supervision; and no work involving commercial driving.  Tr. 44-45.  The VE indicated that the described individual would be unable to perform any of Casebolt's past work.  Tr. 45.  However, the VE indicated there were other jobs that the described individual could perform, including (1) cleaner, housekeeping (SVP 2, light level); (2) cashier (SVP 2, light level); and (3) cafeteria attendant (SVP 2, light level).[9]  Tr. 45-46.

The ALJ then asked the VE a second hypothetical, which was the same as the first hypothetical except the individual would require redirection 15% of the time, every day.  Tr. 46.  The VE indicated that the second hypothetical would preclude employment in competitive work.  Tr. 46.

In response to an inquiry from Casebolt's counsel, the VE indicated that the customary tolerances for absences in unskilled work is no more than one day per month.  Tr. 46.

---

[8] SVP refers to the DOT's listing of a specific vocational preparation (SVP) time for each described occupation. Social Security Ruling No. 00-4p, 2000 WL 1898704, *3 (Dec. 4, 2000).   Using the skill level definitions  in 20 CFR § 416.968, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT.  *Id.*

[9] The VE provided state and national job numbers for each of the identified jobs.  Tr. 45-46.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[10] . . . .

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,[11] claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If

---

[10] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423(d)(2)(A).

[11] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience. 20 C.F.R. § 416.925.

claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform work available in the national economy. *Id.*

## IV. The ALJ's Decision

In his March 14, 2016, decision, the ALJ made the following findings:[12]

1.  Casebolt met the insured status requirements of the Social Security Act through March 31, 2009. Tr. 17

2.  Casebolt had not engaged in substantial gainful activity since October 3, 2013, the amended alleged onset date. Tr. 17-18.

3.  Casebolt had the following severe impairments: unspecified arthropathies, headaches, obesity and borderline intellectual functioning. Tr. 18. Diabetes mellitus and hypothyroidism were non-severe impairments. Tr. 18.

4.  Casebolt did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. Tr. 18-20.

5.  Casebolt had the RFC to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he could frequently push/pull and frequently use foot pedals bilaterally; can frequently climb ramps and stairs; can occasionally climb ladders, ropes or scaffolds; can constantly balance; can frequently stoop, kneel, crouch and crawl; has no manipulative, visual or communicative limitations; cannot be exposed to high concentration of noise; cannot perform complex tasks; can perform simple, routine tasks; can perform low stress work, and cannot have high

---

[12] The ALJ's findings are summarized.

production quotas or piece rate work; cannot do work involving arbitration, confrontation, negotiation and supervision or commercial driving.  Tr. 20-25.

6.    Casebolt was unable to perform any past relevant work because it exceeded his exertional and/or mental limitations. Tr. 25.

7.    Casebolt was born in 1963 and was 49 years old, defined as a younger individual 18-49, on the amended alleged disability onset date and subsequently changed age category to closely approaching advanced age. Tr. 25.

8.    Casebolt had a limited education and was able to communicate in English. Tr. 25.

9.    Transferability of job skills was not material to the determination of disability.  Tr. 25.

10.   Considering Casebolt's age, education, work experience and RFC, there were jobs that existed in significant numbers in the national economy that Casebolt could perform, including cleaner, housekeeping; cashier; and cafeteria attendant.  Tr. 26.

The ALJ determined that, based on the SSI application filed on December 24, 2013, Casebolt was not disabled under the Social Security Act.  Tr. 26-27.

## V. Plaintiff's Arguments

Casebolt raises two arguments.  First, he argues that the ALJ's credibility determination is not supported by substantial evidence.  Doc. 13, pp. 9-11.  Second, he argues that the ALJ erred by failing to address all supported non-exertional limitations in his RFC analysis.  Doc. 13, pp. 12-13.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less

than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

## A.     The ALJ did not err in assessing Casebolt's credibility

Casebolt argues that the ALJ did not properly assess his credibility. Doc. 13, pp. 9-11.

Social Security Ruling 96–7p, *Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements*, 1996 WL 374186, at 3 (July 2, 1996) ("SSR 96-7p")[13] and 20 C.F.R. § 416.929 describe a two-part process for assessing the credibility of an individual's subjective statements about his or her symptoms. First, the ALJ must determine whether a claimant has a medically determinable physical or mental impairment that can reasonably be expected to produce the symptoms alleged; then the ALJ must evaluate the

---

[13] SSR 96-7p was in effect on March 14, 2016, the date of the ALJ's decision. SSR 16-3p, with an effective date of March 28, 2016, supersedes SSR 96-7p. 2016 WL 1119029 (March 16, 2016); 2016 WL 1237954 (March 24, 2016).

intensity and persistence associated with those symptoms to determine how those symptoms limit a claimant's ability to work.

When evaluating the intensity and persistence of a claimant's symptoms, consideration is given to objective medical evidence and other evidence, including: (1) daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (5) treatment, other than medication, received for relief of pain or other symptoms; (6) any measures used to relieve pain or other symptoms; and (7) other factors concerning functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 416.929(c); SSR 96–7p.

"An ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility. Nevertheless, an ALJ's assessment of a claimant's credibility must be supported by substantial evidence." *Calvin v. Comm'r of Soc. Sec.*, 437 Fed. Appx. 370, 371 (6th Cir. 2011) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir.1997)).

Consistent with the Regulations, the ALJ considered Casebolt's allegations, stating:

[B]ased on the claimant's ability to work at or near the level of substantial gainful activity for an extended time period, I find his allegations of a total inability to work less credible

Tr. 18.

[T]he claimant told Dr. Gustavo Gomez, M.D. that he was "looking to be classified as disabled for financial assistance" (Exhibit 4F:1). The claimant reported that he was homeless (Exhibit 4F:58). In addition, the claimant worked at or near SGA levels for nearly six months in 2015 (Exhibit 17E:2). The claimant told Dr. Cisarik that he was working odd jobs (Exhibit 4F:58). On December 2, 2014, the claimant reported to his nurse practioner [sic] that he was trying to find work (Exhibit 4F: 129). Despite the claimant's reports of severe pain, he was able to work on cars (Exhibit 4F:51). In combination, this suggests that the claimant may have sought

21

benefits due to his financial situation and homelessness, rather than an inability to work.

Tr. 21.

Casebolt takes issue with the ALJ's consideration of his ability to work at or near SGA when assessing his credibility, arguing that the ALJ did not take into account the fact that his output while at work was below average; that he had to miss work because of his disability, and that doctors opined that Casebolt would require additional guidance. Doc. 13, p. 10. The regulations make clear that daily activities is an appropriate factor to consider when assessing an individual's credibility. *See* 20 C.F.R. § 416.929(c)(3)(i). Further, an ALJ may consider "other factors" as well when assessing credibility. 20 C.F.R. § 416.929(c)(3)(vii). In light of these regulations, it was not improper for the ALJ to consider Casebolt's daily activities, which included both working at or near SGA for a period of time as well as working odd jobs. Further, Casebolt's claim that the ALJ ignored evidence that his output was below average while working at Heisler Tool for six months or that consultative and/or reviewing physicians opined that Casebolt would need additional guidance is unsupported by the record. The ALJ did not ignore this evidence. *See* Tr. 18 ("His employer reported that he was terminated, and he had below average work quality and attendance issues[.]"); Tr. 19, 22 ("Dr. Konieczny wrote that the claimant would appear to require some degree of supervision and monitoring in the management of his daily activities and in handling his financial affairs."); Tr. 24 (Dr. Rivera stated, "the claimant will benefit from having a supervisor or coworker available to occasionally explain tasks and redirect[.]"). The ALJ considered the entirety of the evidence, including the medical evidence, and included both physical and mental limitations in the RFC. Tr. 20. And, as discussed more fully below in addressing Casebolt's second argument, Casebolt has not shown that the ALJ erred in weighing the medical opinion evidence or in formulating Casebolt's RFC.

Casebolt also contends that the ALJ's consideration of his financial hardships was improper, arguing "Most claimants seeking benefit from Social Security are in need of financial assistance, and it is one of the prerequisites to obtaining SSI benefits.  It then does not logically follow to deny someone benefits because they are in financial need."  Doc. 13, p. 17.  The ALJ did not deny Casebolt benefits because of his financial situation.  Rather, the ALJ considered Casebolt's own statements to medical providers about why he was seeking social security benefits in conjunction with his reported daily activities, his reported attempts to look for work, and his ability to work at or near SGA for nearly six months and work odd jobs, to find his allegations not entirely credible.

Casebolt also argues that the ALJ's credibility determination is flawed because examining and reviewing physicians found him reliable.  Doc. 13, p. 11.  An ALJ is not bound by a physician's statements or opinions.  Rather, "an ALJ is charged with the duty of observing a witness's demeanor and credibility."  *Calvin*, 437 Fed. Appx. at 371.  Further, as required by the regulations, the ALJ considered and weighed the opinion evidence.  In doing so, the ALJ provided little weight to Dr. Bradford's opinion and partial weight to the opinions of Dr. Konieczny and Dr. Rivera.  Tr. 23-25.  Thus, the fact that the ALJ did not adopt their opinions wholesale is not surprising or error.

The ALJ's decision makes clear that the ALJ fully considered the record and assessed the credibility of Casebolt's subjective statements and did not limit his credibility assessment to one piece of evidence.  Having reviewed the ALJ's decision, and considering that an ALJ's credibility assessment is to be accorded great weight and deference, the undersigned finds that the ALJ's credibility analysis regarding the severity of Casebolt's impairments is supported by

substantial evidence.  Accordingly, reversal and remand is not warranted based on the ALJ's credibility assessment.

**B.    The ALJ did not err in weighing the medical opinion evidence or in formulating Casebolt's RFC**

Casebolt argues that the ALJ erred by not including non-exertional limitations in the RFC that Casebolt contends are supported by the record.  In particular, he argues that the ALJ should have included a limitation in the RFC to account for Dr. Rivera's opinion that Casebolt needs "instructions to be occasionally repeated, and requires a supervisor to be available to explain tasks and to redirect."  Doc. 13, p. 17.   Dr. Rivera offered other opinions, including that, Casebolt can understand one-to-three step instructions, can perform one-to-three step tasks of a repetitive nature, and can adapt to a static work setting.  Tr. 89-91.

As a non-examining reviewing psychologist, Dr. Rivera did not have an ongoing treatment relationship with Casebolt and, therefore, Dr. Rivera's opinion was not entitled to deference or controlling weight under the treating physician rule.  *See Kornecky v. Comm'r of Soc. Sec*, 167 Fed. Appx. 496, 508 (6th Cir. 2006)*; Daniels v. Comm'r of Soc. Sec.,* 152 Fed. Appx. 485, 490 (6th Cir. 2005).   It is the ALJ's responsibility to evaluate the opinion evidence using the factors set forth in 20 C.F.R. § 416.927.  Those factors include (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors that tend to support or contradict the opinion.  *See* 20 C.F.R. § 416.927(c)*.*

Furthermore, although Dr. Rivera was not treating physician, the ALJ considered the opinion and, consistent with the regulations explained the weight assigned to Dr. Rivera's opinion, stating,

On July 17, 2014, state agency psychological consultant Dr. Aracelis Rivera, Psy.D. opined that the claimant could understand and remember one to three step instructions of a repetitive nature (Exhibit 6A:11). Occasionally, instructions may require repetition (Exhibit 6A:10). The claimant will benefit from having a supervisor or coworker available to occasionally explain tasks and redirect (Exhibit 6A:11). The claimant would not be well suited for work that entails customer service, persuasion or conflict resolution. The claimant can interact with supervisors or coworkers superficially. The claimant can adapt to a static work setting (Exhibit 6A:12). I give partial weight to this opinion, however the medical evidence of record as a whole does not persuade me that the claimant's is so limited. Particularly, the claimant was able to work at or near SGA levels for almost six months in 2015 (Exhibit 17E:2). This persuades me that the claimant is more capable to the extent described in the residual functional capacity findings above. In addition, Dr. Konieczny, and expert in disability evaluation, opined that the claimant had no significant limitation in the ability to understand, remember and carry out instructions (Exhibit 3F:5). He had no significant limitations in attention, concentration, persistence and single and multi-step tasks. He would have some diminished tolerance for frustration and diminished coping skills, which would impact his ability to respond to severe supervision and interpersonal situations in the work stetting. He would seem capable of responding appropriately to normal such situations. This suggests that the claimant has greater abilities than Dr. Rivera opined.

Tr. 24-25.

Here, the ALJ assigned partial weight to Dr. Rivera's opinion, finding that Casebolt's ability to work at or near SGA levels for almost six months demonstrated that Casebolt was not as limited as Dr. Rivera opined. Casebolt challenges the ALJ's reliance on his ability to work at or near SGA levels for almost six months, arguing again, as he did when challenging the ALJ's credibility determination, that the ALJ did not take into account statements from Casebolt's former employer that indicated that Casebolt's work was below average and he needed more instructions. Doc. 13, p. 12 (citing Tr. 264 – statement from former employer). As discussed above, the ALJ did not ignore evidence regarding Casebolt's performance while working at Heisler Tool. *See* Tr. 18. In fact, the ALJ specifically referred to the report from Heisler Tool and acknowledged that the work might have been accommodated work. Tr. 18. Thus, it is clear

that ALJ considered this evidence and it is not for this Court to try the case *de novo*. *Garner*, 745 F.2d at 387.

Casebolt also contends that the ALJ erred in not including a limitation in the RFC for increased supervision because both Dr. Rivera's opinion and Dr. Konieczny's opinion support such a limitation. Casebolt points to Dr. Konieczny's statement that Casebolt "would appear to require some degree of supervision and monitoring in the management of his daily activities and in the handling of his financial affairs." Doc. 13, p. 13. However, this statement does not address the need for supervision in a work setting. As noted by the ALJ, Dr. Konieczny opined that Casebolt had no significant limitations in his ability to understand, remember and carry out instructions and no significant limitations in his ability to concentrate and persist in single and multi-step tasks. Tr. 24, 292. However, considering the other evidence in the record, including Dr. Rivera's opinion, the ALJ gave partial weight to Dr. Konieczny's opinion because he concluded that Casebolt had greater limitations with regard to understanding, remembering and carrying out instructions and Casebolt's IQ suggested greater limitations than those found by Dr. Konieczny. Tr. 24. Casebolt appears to take issue with the ALJ's consideration of Dr. Rivera's opinion when weighing Dr. Konieczny's opinion and the ALJ's consideration of Dr. Konieczny's opinion when weighing Dr. Rivera's opinion. However, the ALJ's analysis shows that the ALJ did as instructed by the regulations, i.e., the ALJ considered the consistency and supportability of both opinions with the record as a whole.

Casebolt also argues that Casebolt's most recent IQ testing, which places him in the borderline range of adult intellectual functioning, shows that Casebolt has further mental limitations. Casebolt does not identify what those further limitations are and, as is clear from the ALJ's discussion and weighing of Dr. Konieczny's opinion, the ALJ considered Casebolt's IQ

testing.  In fact, the ALJ concluded that the IQ testing suggested greater limitations than those opined by Dr. Koniecczy and included mental limitations in the RFC that the ALJ found supported by the record: namely,

> [Casebolt] cannot perform complex tasks. He can perform simple, routine tasks, can perform low stress work, and cannot have high production quotas or piece rate work. He cannot do work involving arbitration, confrontation, negotiation and supervision or commercial driving.

Tr. 20.

Casebolt also argues that the ALJ, a layperson, ignored the conclusions of medical professionals.  The regulations, however, make clear that a claimant's RFC is an issue reserved to the Commissioner and the ALJ assesses a claimant's RFC "based on all of the relevant evidence" of record. 20 C.F.R. §§ 416.945(a); 416.946(c).  It is the responsibility of the ALJ, not a physician, to assess a claimant's RFC.  *See* 20 C.F.R. § 416.946(c); *Poe v. Comm'r of Soc. Sec.*, 342 Fed. Appx. 149, 157 (6th Cir.2009).  Further, the ALJ "is not required to recite the medical opinion of a physician verbatim in his residual functional capacity finding . . . [and] an ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding." *Id.* (internal citations omitted); *see also Coldiron v. Comm'r of Soc. Sec.*, 391 Fed. Appx. 435, 439 (6th Cir. 2010) ("The Social Security Act instructs that the ALJ—not a physician—ultimately determines a claimant's RFC").

Here, the ALJ considered the evidence of record, sufficiently explained the weight assigned to the medical opinion evidence, and Casebolt has not shown that the ALJ's decision to assign partial weight to the opinions of Dr. Konieczny and Dr. Rivera is unsupported by substantial evidence.  Further, Casebolt has not shown that the RFC is not supported by substantial evidence.  As indicated, an ALJ, not a physician, assesses the claimant's RFC.  Thus, even if "great weight" is assigned to an opinion, which did not occur in this case, an ALJ is not

required to adopt wholesale limitations contained therein. *Moore v. Comm'r of Soc. Sec.*, 2013 WL 6283681, * 7-8 (N.D. Ohio Dec. 4, 2013) (M.J. White) (even though the ALJ did not incorporate into the RFC all limitations from a consultative examiner's opinion that the ALJ assigned great weight to, the ALJ's decision was not procedurally inadequate nor unsupported by substantial evidence); *see also Smith v. Comm'r of Soc. Sec.*, 2013 WL 1150133, * 11 (N.D. Ohio Mar. 19, 2013) (M.J. Knepp), *affirmed*, 6th Cir. 13-3578 (Jan. 30, 2014) (ALJ not obligated to explain each and every limitation or restriction adopted or not adopted from a non-examining physician's opinion).

Having considered Casebolt's arguments, the Court finds no error with respect to the ALJ's weighing of the medical evidence or the RFC assessment. Accordingly, reversal and remand is not warranted.

## VII. Conclusion

For the reasons set forth herein, the Court finds no error by the ALJ and finds that the ALJ's decision is supported by substantial evidence. Therefore, the Court **AFFIRMS** the Commissioner's decision.

Dated: February 21, 2018

Kathleen B. Burke
United States Magistrate Judge